# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| CECILIA L. SIMMONS, et al., <br>     Plaintiffs | Case No. 1:04-cv-478 <br> (Hogan, M.J.) |
| vs | |
| MIAMI VALLEY TROTTING, INC., et. al., <br>     Defendants | **ORDER** |

Plaintiffs Cecilia L. Simmons and Donna M. Singleton bring this employment discrimination action against defendants Miami Valley Trotting Club, Inc., Lebanon Trotting Club, Inc., and Keith Nixon alleging claims of sexual harassment, constructive discharge, and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and Ohio Rev. Code § 4112.02(A), and Ohio Rev. Code § 4112.99. This matter is before the Court on defendants' motion for summary judgment (Doc. 18), plaintiffs' memorandum in opposition thereto (Doc. 23), and defendants' reply memorandum. (Doc. 24).

**FACTS**

Defendants, Miami Valley Trotting, Inc. and Lebanon Trotting Club, Inc. are Ohio, for-profit corporations that operate Lebanon Raceway in Lebanon, Ohio. Each corporation operates the Raceway for approximately six months per year and employs approximately 100 people. Defendant Keith Nixon is the General Manager of Miami Valley Trotting, Inc. and Lebanon Trotting Club, Inc., and part owner of Miami Valley Trotting, Inc.

Plaintiffs Cecilia Simmons and Donna Singleton are former maintenance employees of the Lebanon Raceway. Both are female. On October 2, 2001, plaintiff Simmons began her

employment at the Raceway when she was 17 years old. She was employed as a maintenance/janitorial worker from that date through August 22, 2003. Plaintiff Singleton began her employment with defendants on or about October 17, 2002. Throughout the course of her employment she served as a maintenance/janitorial worker until her resignation on August 27, 2003.

Both Simmons and Singleton allege that defendant Nixon repeatedly made unwelcome sexual remarks directed toward them and on three occasions made unwanted sexual advances. Plaintiff Simmons testified that the first instance occurred in July 2002. She stated that she went up to Nixon's office to clean his bathroom and vacuum his carpet. Nixon, who was 55 years old at the time, allegedly told her to have a seat on the couch and sat down next to her. He then proceeded to place his hand on her leg, causing her to get up and walk out. (Simmons Depo. at 39-40). Later that day, Nixon tried to hand Simmons $60.00 telling her to "have a good time on him," which she refused. *Id*. Simmons went to her father, who was her supervisor at the time, who advised her to report the incident to Neil Hoffman, his supervisor. *Id*. She did and Hoffman allegedly stated he would take care of it. *Id*.

After Singleton began her employment at the Raceway in October 2002, Nixon allegedly began making sexual comments directed towards both women. (Simmons Depo. at 42). Both Simmons and Singleton recall that Nixon made such remarks to them nearly every day thereafter. (Simmons Depo. at 43-44, 68, 73, 92-94; Singleton Depo. at 36, 40, 42). Plaintiffs testified that the following sexual remarks by Nixon exemplified his behavior towards them:

> 1. Asking them if they would consider having sex for money, or if they had ever been paid for sex. (Simmons Depo. at 45; Singleton Depo. at 36.)

> 2. Frequently telling plaintiffs they were "hot", or that they "looked good" to him.

2

>(Simmons Depo. at 43, 92; Singleton Depo. at 36.)
>
>3. Asking Simmons if she would perform oral sex on him. (Simmons Depo. at 51.)
>
>4. Telling Simmons how big her breasts looked. (Simmons Depo. at 52-53.)
>
>5. Telling plaintiffs he "needed to get some young pussy." (Simmons Depo. at 69.)
>
>6. Asking the maintenance employees, including plaintiffs, if they were all "sleeping together." (Simmons Depo. at 93-94.)
>
>7. Asking Singleton if she was married, and if she would leave her husband. (Singleton Depo. at 36.)
>
>8. Telling plaintiffs he would like to "do" them. (Singleton Depo. at 54.)

Plaintiff Simmons testified that Nixon also placed his hands on her buttocks. (Simmons Depo. at 44-45). Plaintiff Singleton testified that Nixon placed his hand on her breast. (Singleton Depo. at 33).

Plaintiffs both testified that they asked a female office employee, Judy Everett, what a person should do if she felt sexually harassed at the Raceway. Ms. Everett allegedly responded that she did not know. Neither the Miami Valley Trotting, Inc. nor the Lebanon Trotting Club, Inc. has ever had a sexual harassment policy of any kind. (Nixon Depo. at 17-18; Hoffman Depo. at 20). Posters explaining employee rights under state and federal anti-discrimination laws are posted on bulletin boards that are accessible to all employees.

Plaintiffs testified that they reported Nixon's behavior both verbally and in writing to their supervisor, Neil Hoffman. (Singleton Depo. at 55; Simmons Depo. at 38). Mr. Hoffman has acknowledged that plaintiffs came to him and reported that defendant Nixon was harassing them. (Hoffman Depo. at 28-29). Hoffman testified these complaints could have begun as far

3

back as 2002. *Id*. In July and August 2003, at Mr. Hoffman's suggestion, plaintiffs provided three written statements concerning Nixon's behavior to Hoffman. (Doc. 18, Hoffman Aff. ¶17, Exhs. D, E, H; Simmons Dep., Exhs. D and E; Singleton Dep., Ex. H).

A written statement dated July 12, 2003 concerned an incident where Nixon allegedly touched plaintiff Singleton's breast. The Raceway is closed for three weeks every July during the Warren County Fair. (Nixon Depo. at 20). During the fair, and at other times during the year, employees of the track sometimes earned extra money working at the farm of Nixon's father, Corwin Nixon. (Hoffman Depo. at 25, 27; Nixon Depo. at 22, 44). In July of 2003, plaintiff Singleton was painting a fence at the farm when Keith Nixon drove by and asked her to get in his pickup truck. (Singleton Depo. at 32). He drove her to a barn on the farm and had her do some work with him there. *Id*. at 32-33. Nixon allegedly told her she had something on her shirt and put his hand on her breast over her clothes. *Id*. Plaintiff Singleton immediately left the barn. *Id*. She soon encountered Mr. Hoffman's subordinate, Manuel Haney, who was supervising the employees working on the farm. *Id*. at 33, 35. Singleton testified that she told Mr. Haney what Nixon had done to her, and he said they would write up a statement when they got back to the track. *Id*. at 35. A statement was in fact prepared and given to Mr. Hoffman. (See Doc. 18, Hoffman Aff. ¶17, Exh. H; Singleton Depo., Exh. H).

Two statements written on August 16, 2003 describe remarks Nixon allegedly made about the maintenance employees "sleeping together" and saying to plaintiffs: "Damn you two girls are hot." (Doc. 18, Hoffman Aff. ¶17, Exhs. E, D; Simmons Depo., Exh. E; Singleton Depo., Exh. D).

Hoffman asked to have other maintenance employees work near plaintiffs because

4

plaintiffs told him they felt uncomfortable working around Nixon. (Doc. 18, Hoffman Aff. ¶15; Hoffman Depo. at 46-47; Thorson Depo. at 19-21, 30-31).

Hoffman took no action on plaintiffs written complaints. (Hoffman Depo. at 39-40). Mr. Hoffman, in his affidavit attached to defendants' motion for summary judgment, states he "was prepared to discuss Simmons' and Singleton's written statements with Nixon, but he was not often present in the workplace during this time period due to his father's illness." (Doc. 18, Hoffman Aff. ¶20). He further states that plaintiffs resigned from their positions before he had the opportunity to speak with Nixon about the complaints. *Id*. at 21. Plaintiffs counter that Keith Nixon's father did not suffer the injury that led to his hospitalization and death until October 1, 2003 (Nixon Depo. at 14-15), and that plaintiffs resigned on August 22 and August 27, 2003, over one month before the elder Mr. Nixon's injury occurred, and a month and a half after Singleton's first written complaint. In addition, Hoffman himself recalls that Keith Nixon was at the Raceway on the very day plaintiff Simmons resigned. (Hoffman Depo. at 50, 61).

On August 22, 2003, plaintiffs were cleaning a bathroom when Nixon came in and allegedly remarked that Simmons' breasts looked big and asked Singleton if she would leave her husband and have sex with him. (Simmons Depo. at 52-53). Plaintiff Simmons then went to Hoffman and told him she was quitting. She said Hoffman had "had months to talk to [Nixon]" about the harassment, and that she "can't put up with it no more." (Singleton Depo. at 54).

On August 27, 2003, plaintiff Singleton resigned. Singleton asked Hoffman if she could work on third shift, at night, so she could be away from Nixon while working. (Singleton Depo. at 25; Hoffman Depo. at 55). She also thought Simmons might be willing to come back to work with her if they could both work when Nixon was not around. (Singleton Depo. at 26). When

5

Hoffman declined to transfer her, Singleton decided to resign rather than continue to face Nixon's harassment alone. (*Id*. at 25-26). Hoffman, in his affidavit, denies that either plaintiff informed him she was resigning because of sexual harassment by Nixon. (Doc 18, Hoffman Aff. ¶¶24, 26).

Three months later, in November of 2003, plaintiff Simmons took a part-time job at the track as a veterinary assistant. (Simmons Depo. at 13). This paid her only $40-$45 per night, and only during the track's "live racing meets" in the spring and fall. (Simmons Depo. at 18, 27). This position allowed her to work at a time and place where she would not encounter Mr. Nixon. (Doc. 23, Tippenhauer Declaration).[1]

On February 12, 2004, both Simmons and Singleton filed Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging they had been sexually harassed by Nixon, and had resigned from their maintenance positions because of the harassment. (Doc. 23, Attachments 3 & 4). In May of 2004, Nixon fired Simmons from her veterinary assistant job. (Simmons Depo. at 64). Simmons was at the track to pick up her final paycheck for the spring meet. Nixon saw her and allegedly told her "you will not be returning for the fall meet." *Id*. at 65. Nixon allegedly summoned the police to have Simmons removed from the premises. *Id.* at 121-122. Simmons subsequently wrote letters to Nixon asking why she had been fired, but Nixon did not respond. (Simmons Depo. at 64; Nixon Depo. at 64). Nixon admitted under oath at his deposition that he fired plaintiff Simmons because of her EEOC charge. (Nixon Depo. at 62, lines 5-7).

On July 23, 2004, plaintiffs filed their complaint in this case. (Doc. 1). The Complaint

---

[1] Plaintiff Simmons recently married and her last name has changed to Tippenhauer.

6

alleged, *inter alia*, that defendants had unlawfully retaliated against Simmons for filing a charge of discrimination with the EEOC. *Id*. Plaintiff Simmons testified that her lawyer wrote a letter and she was able to return to work at the Raceway by the time the next live racing meet began in the fall of 2004. (Simmons Depo. at 65). Simmons is currently employed as a veterinary assistant with defendants. (Simmons Depo. at 13).

## OPINION

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Under Federal Rule of Civil Procedure 56(c), a grant of summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Satterfield v. Tennessee*, 295 F.3d 611, 615 (6th Cir. 2002). The Court must evaluate the evidence, and all inferences drawn therefrom, in the light most favorable to the non-moving party. *Satterfield,* 295 F.3d at 615; *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Little Caesar Enterprises, Inc. v. OPPC, LLC*, 219 F.3d 547, 551 (6th Cir. 2000).

If, after an appropriate time for discovery, the opposing party is unable to demonstrate a *prima facie* case, summary judgment is warranted. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)(citing *Celotex* and *Anderson*). Summary judgment "will not lie if the

dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587. The Court's function is not to weigh the evidence; its duty is to determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252; *Little Caesar*, 219 F.3d at 551.

**Hostile Environment Sexual Harassment**

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex. . . ." 42 U.S.C. § 2000e-2(a).[2] "[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66 (1986). Discrimination based on a hostile or abusive work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems*, 510 U.S. 17, 21 (1993)(citations and internal quotation marks omitted). To establish a

---

[2] Federal case law interpreting Title VII is applicable to claims asserted under Ohio Rev. Code § 4112.02. *See Ohio Civil Rights Comm'n v. Ingram*, 630 N.E.2d 669 (Ohio 1994); *Little Forest Med. Center of Akron v. Ohio Civil Rights Comm.*, 575 N.E.2d 1164 (Ohio 1991); *Osman v. Isotec, Inc.*, 960 F. Supp. 118, 120-21 (S. D. Ohio 1997)(Dlott, J.). Accordingly, this Court's opinion with respect to plaintiffs' Title VII claims applies with equal force and effect to plaintiffs' discrimination claims asserted under the Ohio civil rights statute.

prima facie case of a hostile work environment based on sex, a plaintiff must show that: (1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) the harassment created a hostile work environment; and (5) the employer is vicariously liable. *Clark v. United Parcel Service, Inc.*, 400 F.3d 341, 347 (6th Cir. 2005); *Williams v. General Motors Corp.*, 187 F.3d 553, 560-561 (6th Cir. 1999). "[E]mployers now have an *affirmative duty* to prevent sexual harassment by supervisors." *Williams*, 187 F.3d at 561 (emphasis in the original). "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). Where the plaintiff shows actionable discrimination and a "tangible employment action" such as "discharge, demotion, or undesirable reassignment" employer liability is automatic. *Williams*, 187 F.3d at 561 n.2, citing *Faragher*, 524 U.S. at 807-808. *See also Clark,* 400 F.3d at 348. If there was no tangible employment action, an employer can escape liability only (1) if it took reasonable care to prevent and correct any sexually harassing behavior; and (2) if the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Faragher*, 524 U.S. at 807-808, citing *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 762-63 (1998).

In the instant case, defendants do not dispute that plaintiffs are members of a protected class. However, defendants contend that plaintiffs were not subject to unwelcome sexual harassment because there is no "objective" evidence supporting such a claim. Defendants contend that plaintiffs' claims of unwanted sexual advances and comments are not corroborated

by other Raceway employees, that the affidavits of defendants' witnesses contradict the claims made by plaintiffs, that plaintiff Singleton never told Nixon his comments were unwelcome, and that Singleton's deposition testimony indicated Nixon touched her bra, while her written statement about the incident states Nixon touched her shirt and not her bra.[3] (Doc. 18 at 6-7).

Contrary to defendants' suggestion, plaintiffs do not rely on the mere allegations of their pleadings (Doc. 18 at 7), but have presented sworn deposition testimony in support of their claims in this matter. Rule 56(e) permits a summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), including deposition testimony. *Celotex Corp. v. Catrett*, 477 U.S. at 324. Plaintiffs' deposition testimony is based on personal observation and experience and is affirmative evidence the Court must not only consider for summary judgment purposes, but must construe in the light most favorable to plaintiffs, drawing all justifiable inferences in their favor. *Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587. What defendants are essentially requesting is for the Court to make a credibility determination and to weigh the evidence at this stage of the proceedings. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" on summary judgment. *Anderson,* 477 U.S. at 255. Thus, the Court must consider plaintiffs' deposition testimony in the light most favorable to plaintiffs in determining whether defendants are entitled to summary judgment on plaintiffs' hostile environment sexual harassment claim.

Plaintiffs' deposition testimony indicates that on an almost daily basis they were

---

[3] Defendants' characterization of Singleton's written statement is incomplete. The statement in full reads, "I was working at the farm during the fair. Keith walked up and said I had something on my shirt and wiped it off *something was on my boobs, that was not right*. /s/ Donna Singleton" (See Doc. 18, Hoffman Aff. ¶17, Exh. H; Singleton Depo., Exh. H)(emphasis added).

subjected to repeated demeaning, degrading and offensive sexual comments, in addition to requests for sexual favors, inappropriate touching, and groping by Keith Nixon, the General Manager of both corporate defendants. Although plaintiff Singleton did not tell Nixon his comments were unwelcome, she testified she feared losing her job by confronting him directly. (Singleton Depo. at 37). A reasonable jury could find this explanation plausible in light of the disparity of power between a lower-level maintenance employee and the owner of the business. Plaintiffs' deposition testimony presents sufficient evidence showing they were subject to unwelcome sexual harassment by Nixon and, to the extent it conflicts with the evidence presented by defendants, presents a credibility issue that may not be resolved on summary judgment.

Defendants also contend that plaintiff were not subject to harassment based on sex and that any alleged harassment was insufficient to maintain a hostile work environment claim. The Court disagrees.

To establish that harassment was "based on sex," plaintiffs "must show that but for the fact of [their] sex, [they] would not have been the object of harassment." *Williams,* 187 F.3d at 565. The existence of gender specific and offensive comments permits an inference that plaintiffs' gender was the motivating factor. *Id*. Here, plaintiffs' evidence shows Nixon made comments about their bodies (referring to the size of Simmons' breasts) or their sexual attractiveness (repeatedly telling plaintiffs they looked "hot" or "good to him"), about his own sexual desires (saying he "needed to get some young pussy") or plaintiffs' sexual practices (asking if the maintenance staff if they were "all sleeping together" and asking plaintiffs if they ever had sex for money), and directly asking for sexual favors (asking Simmons for oral sex and

11

telling plaintiffs what he would like to "do" to them). This evidence is sufficient to meet the third prima facie element.

To satisfy the fourth *prima facie* element, plaintiffs must demonstrate that the workplace was permeated with discriminatory intimidation, ridicule, or insult sufficiently severe or pervasive to alter their employment conditions and create an abusive or hostile working environment. *Harris v. Forklift Systems*, 510 U.S. 17, 21 (1993)(citing *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65 (1986)). *See also Crawford v. Medina General Hospital,* 96 F.3d 830, 834-35 (6th Cir. 1996). The harassment must be evaluated both objectively and subjectively. In other words, plaintiffs must subjectively perceive the work environment to be hostile or abusive, and the environment must be one in which a reasonable person could objectively conclude the same. *Id.*; *Williams*, 187 F.3d at 566. This question can only be answered by looking at the totality of the circumstances. *Harris*, 510 U.S. at 23.

In reviewing the totality of the circumstances, the Court may consider the following factors: (1) the frequency of the alleged discriminatory conduct; (2) the conduct's severity; (3) whether the conduct was physically threatening or humiliating or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with plaintiffs' work performance. *Id.* Plaintiffs need not prove that their work performance declined or suffered, merely that the harassment made it more difficult for them to do their jobs. *Harris*, 510 U.S. at 25 (Ginsburg, J., concurring). Nevertheless, while offensive comments may contribute to creating an actionable hostile working environment claim, the mere utterance of an epithet or use of harsh language that engenders offensive feelings in an employee does not sufficiently affect employment conditions so as to violate Title VII. *See Harris,* 510 U.S. at 21-22; *Crawford,* 96 F.3d at 835.

In the instant case, plaintiffs' evidence shows that Nixon's actions were sufficiently severe or pervasive to create a hostile work environment. Although plaintiffs reduced their complaints to writing on only three occasions, they testified that Nixon made sex-based comments and remarks to both woman nearly every day. (Simmons Depo. at 43-44, 68, 73, 92-94; Singleton Depo. at 36, 40, 42). In addition, plaintiffs testified that on three different occasions Nixon physically placed his hands on them, touching Simmons' leg and buttocks, and Singleton's breast.[4] The specific comments outlined at pages two and three of this Order, *supra*, in combination with the offensive physical touching are more than mere, isolated offensive utterances. Plaintiffs "subjectively perceive[d] the environment to be abusive," *Harris,* 510 U.S. at 21, and construing the totality of the evidence in the light most favorable to plaintiffs, Nixon's conduct was commonplace, ongoing and continuing such that it was sufficiently pervasive and severe to create a hostile work environment. *See Abeita v. Transamerica Mailings, Inc.,* 159 F.3d 246, 252 (6th Cir. 1998).

Finally, defendants Miami Valley Trotting Club, Inc., Lebanon Trotting Club, Inc. are vicariously liable for a hostile work environment created by Nixon, a supervisor with immediate or successively higher authority over plaintiffs. *Faragher*, 524 U.S. at 807. Accordingly,

---

[4] Defendants incorrectly assert that the alleged incident at Corwin Nixon's farm is not relevant to plaintiffs' sexual harassment claim because any alleged misconduct occurred outside of the workplace. "[W]hen an employee is forced to work for, or in close proximity to, someone who is harassing her outside the workplace, the employee may reasonably perceive the work environment to be hostile." *Duggins ex rel. Duggins v. Steak'N Shake, Inc.*, 3 Fed. Appx. 302, *311 (6th Cir. 2001), and cases cited therein. The evidence presented by plaintiffs shows this was not a single incident of misconduct on the part of Nixon, but rather one of many verbal and physical instances of unwelcome, sexual harassment. Coupled with the fact that it was routine for Raceway employees to work on Nixon's father's farm during the three weeks of the Warren County Fair and that Nixon himself directed plaintiff to work in the barn where the alleged incident occurred, the Court finds such evidence to be relevant to determining the severity and pervasiveness of the hostility in the workplace as well as to establish that the conduct was motivated by gender. *See Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 409-10 (1st Cir. 2002).

plaintiffs have presented sufficient evidence from which a reasonable jury could conclude that plaintiffs suffered a hostile work environment based on their sex. Therefore, defendants' motion for summary judgment on plaintiffs' hostile environment sexual harassment claim is denied.

**Constructive Discharge**

To establish a constructive discharge claim based on a hostile work environment, a plaintiff must make a showing beyond that of a hostile work environment. The plaintiff must show "that the abusive working environment became so intolerable that her resignation qualified as a fitting response." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 133 (2004). "Creation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case." *Id*. at 149. The Supreme Court explained:

> For an atmosphere of sexual harassment or hostility to be actionable . . . the offending behavior 'must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' *Meritor*, 477 U.S., at 67, (internal quotation marks and brackets omitted). A hostile- environment constructive discharge claim entails something more: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign. *See, e.g., Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1160 (8th Cir. 1999) ("[A]lthough there may be evidence from which a jury could find sexual harassment, ... the facts alleged [for constructive discharge must be] ... so intolerable that a reasonable person would be forced to quit."); *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997) ("[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress.").

*Suders*, 542 U.S. 146-47 (footnote omitted). "This heightened constructive discharge standard requires an objective assessment of the employee's feelings, and an inquiry into the employer's intent and the foreseeability of the impact its conduct had on the employee." *Collette v. Stein-Mart, Inc.,* 126 Fed. Appx. 678, 682 (6th Cir. 2005) (unpublished), citing, *Peters v. Lincoln*

14

*Elec. Co.*, 285 F.3d 456, 478 (6th Cir. 2002). Under the objective assessment, plaintiffs must show "working conditions so intolerable that a reasonable person would have felt compelled to resign." *Suders*, 542 U.S. at 147. In this regard, the Court must, from the point of view of a reasonable member of the protected class, examine the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Goldmeier v. Allstate Ins. Co.*, 337 F.3d 629, 635 (6th Cir. 2003), *cert. denied*, 540 U.S. 1106 (2004), quoting *Harris*, 510 U.S. at 23. *See also Yates v. Avco Corp.*, 819 F.2d 630, 636-37 & n. 2 (6th Cir. 1987) (evaluating whether sexual harassment constitutes constructive discharge from the point of view of a reasonable member of the gender being harassed). The "employer" inquiry focuses on whether the employer intended the work environment to cause the employee to resign. *Yates*, 819 F.2d at 637. "The seemingly stringent intent requirement can, however, be met 'by demonstrating that quitting was a foreseeable consequence of the employer's actions.'" *Goldmeier*, 337 F.3d at 636, quoting *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999). *See also Wheeler v. Southland Corp.*, 875 F.2d 1246, 1249 (6th Cir. 1989) (constructive discharge arose where reasonable employer would have foreseen that employee would resign given regular and frequent sexual harassment including physical contact).

Plaintiffs have presented sufficient evidence to create an issue of fact as to whether defendants created working conditions so intolerable that a reasonable person in plaintiffs' positions would have felt compelled to resign for purposes of meeting the first prong of the constructive discharge inquiry. *See Moore*, 171 F.3d at 1080. Plaintiffs' evidence, viewed in the

light most favorable to plaintiffs, shows that not only were they faced with a barrage of offensive and crude sexual remarks on an almost daily basis, but that such comments were directed at them. In addition to the verbal remarks, plaintiffs were subjected to unwanted physical contact by Nixon. Moreover, defendants had no sexual harassment policy whatsoever. Thus, there were no rules guiding plaintiffs in their attempts to thwart Nixon's actions. Plaintiffs repeatedly reported Nixon's actions to their supervisor Mr. Hoffman who promised he would "take care of it." Evan after reducing their concerns to writing in July and August 2003, Hoffman failed to take any action in response. Moreover, the alleged harassment was at the hands of the general manager of both corporations. There was no higher authority to appeal to or from whom to seek help. Singleton sought a schedule change to avoid working while Nixon was around, but was denied. Given the totality of the circumstances faced by plaintiffs, a reasonable employee in their positions would have felt compelled to resign.

Plaintiffs have also presented evidence creating an issue of fact as to the second prong of the inquiry on the issue of defendants' intent. It is completely foreseeable that a reasonable person would have resigned under the circumstances faced by plaintiffs. Plaintiff Simmons' resignation was a foreseeable consequence of being subjected to a barrage of sexual comments and remarks on an almost daily basis, being touched on her buttocks and leg, and seeing no remedial action taken by Hoffman after repeated verbal and written complaints about sexual harassment at the hands of Keith Nixon. Likewise, plaintiff Singleton's resignation was reasonably foreseeable. Singleton's evidence shows Nixon's sexual remarks were unwelcome, pervasive and ongoing, and that his harassment included the unwanted touching of her breast. Her complaints were not acted upon and, after being denied a shift change to avoid encountering

Nixon, and being faced with the continuing prospect of additional sexual harassment from her boss with no remedy in sight, it was reasonably foreseeable she would resign. A reasonable employer would have foreseen that plaintiffs would resign when forced to work under the person who was sexually harassing them without any prospect of remedial action. *See Wheeler*, 875 F.2d at 1250. Construing the evidence and all inferences to be drawn therefrom in the light most favorable to plaintiffs, as the Court must do on this motion, defendants have failed to establish the absence of a genuine issue of material fact as to plaintiffs' constructive discharge claim. Since plaintiffs have presented evidence from which a jury could find that their working conditions were so difficult or unpleasant that a reasonable person in their shoes would have felt compelled to resign, defendants' motion for summary judgment on plaintiffs' constructive discharge claim is denied.

**Retaliation Claim**

To establish a prima facie case of retaliation pursuant to Title VII, a plaintiff must show that: (1) he engaged in an activity protected by Title VII; (2) the defendant knew he engaged in this protected activity; (3) thereafter, the defendant took an employment action adverse to him; and (4) there was a causal connection between the protected activity and the adverse employment action. *Smith v. City of Salem, Ohio*, 378 F.3d 566, 570 (6th Cir. 2004), citing *DiCarlo v. Potter*, 358 F.3d 408, 420 (6th Cir. 2004). An adverse employment action is defined as a "materially adverse change in the terms and conditions of [plaintiff's] employment," *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999), and includes firing, failing to promote, reassignment with significantly different responsibilities, a material loss of benefits, suspensions,

and other indices unique to a particular situation. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); *Smith*, 378 F.3d at 575-76.  De minimus employment actions are not actionable, *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000), nor do events such as a bruised ego, mere inconvenience, or an alteration of job responsibilities constitute an adverse employment action. *Smith*, 378 F.3d at 575.

Defendants contend that plaintiff Simmons fails to make a *prima facie* case of unlawful retaliation because she fails to establish the element of an adverse employment action. Defendants argue that Simmons continued to work as a veterinary assistant through the end of the Spring 2004 racing season, that paddock employees did not work during the summer months, and that she resumed her employment as a veterinary assistant for the Fall 2004 racing season with no loss of pay. (Doc. 18 at 12).

As plaintiff correctly points out, defendant Nixon admitted at his deposition that he fired Simmons because she filed an EEOC charge of discrimination. (Nixon Depo. at 62).  Plaintiff testified that on the day she was fired, Nixon summoned the police to have her removed from the premises. (Simmons Depo. at 121-22).  Plaintiff also presents evidence that it was not until after she retained counsel and filed this lawsuit that she was reinstated to the veterinary position in the fall of 2004. (Simmons Depo. at 65).  Under such circumstances, the Court finds plaintiff suffered and adverse employment action as a result of her firing after filing a charge of discrimination with the EEOC.  *See White v. Burlington N. & Santa Fe Ry. Co.,* 364 F.3d 789, 802 (6th Cir. 2004) (en banc), *cert. granted in part*, 126 S.Ct. 797 (2005)(suspension without pay for 37 days followed by a reinstatement with back pay is an adverse employment action). *See also Smith*, 378 F.3d at 576 (finding equivalent of a three-day suspension is an adverse

employment decision under Title VII).  The Sixth Circuit in *White* noted that the adverse action element "is a warranted judicial interpretation of Title VII intended to deter discrimination lawsuits based on trivial employment actions, such as those that cause a 'mere inconvenience' or a 'bruised ego.'"  *White,* 364 F.3d at 802.  While plaintiff Simmons did not lose a paycheck because of the seasonal nature of the work and the fortuitous timing of the lawsuit and her reinstatement, "the purpose of Title VII to make persons whole for injuries suffered on account of unlawful employment discrimination." *White*, 364 F.3d at 802, quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975).  Not only does Title VII assure that a wrongfully terminated employee will receive back pay, but receive "other damages, which have been explicitly authorized by Title VII since the Civil Rights Act of 1991, such as interest on the back pay, attorney's fees, emotional suffering, and punitive damages. 42 U.S.C. §§ 1981a(b); 2000e-5(g), (k). . . .  Congress has declared that part of making a Title VII plaintiff whole is compensating her for interest on the back pay, attorney's fees, and emotional suffering." *White*, 364 F.3d at 802.  Because Nixon admits firing Simmons because she filed an EEOC charge and Simmons was not rehired until after legal action was taken on her behalf, the Court finds the firing to be an adverse employment action for purposes of her retaliation claim.  Therefore, plaintiff Simmons' retaliation claim does not fail on the basis of no adverse employment action.  Defendants' motion

for summary judgment is therefore denied on this claim as well.

For the foregoing reasons, defendants' motion for summary judgment is **DENIED**.

**IT IS SO ORDERED**.

Date: 4/14/2006                    s/Timothy S. Hogan
                                   Timothy S. Hogan
                                   United States Magistrate Judge